UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-6520-MJ-HUNT

UNITED STATES OF AMERICA

v.

MALIK DELANCY,
FIERO COOPER,
DARREN SEARS,
IVAN CURRY, and
JEREMIAH RUSSELL,

        **Defendants.**

FILED BY ____ AT ____ D.C.

Sep 4, 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)?   No

2. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023?   No

3. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024?   No

4. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024?   No

      Respectfully submitted,

      JASON A. REDING QUIÑONES
      UNITED STATES ATTORNEY

By:    */s/ James M. Ustynoski*
      James M. Ustynoski
      Assistant United States Attorney

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>FIERO COOPER, et al.,<br><br>*Defendant(s)* | Case No. 25-MJ-6520-PMH<br><br>FILED BY ____ D.C.<br>SEP 04 2025<br>ANGELA E. NOBLE<br>CLERK U.S. DIST. CT.<br>S. D. OF FLA. - FT. LAUD. |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  April 2025 through August 30, 2025  in the county of  Broward  in the
 Southern  District of  Florida and elsewhere , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 952(a) and 963 | Conspiracy to Import a Controlled Substance into the United States (cocaine) |
| Title 8, United States Code, Section 1324(a)(1)(A)(iv) | Encouraging or Inducing an Alien to Enter the United States |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Joseph Verneer, DEA
*Printed name and title*

Sworn to before me via FaceTime.

Date: 9/4/2025

_____
*Judge's signature*

City and state:  Fort Lauderdale, Florida   Hon. Patrick M. Hunt, U.S. Magistrate Judge
*Printed name and title*

AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Joseph C. Verneer (Affiant), being duly sworn, depose and state as follows:

1. Your affiant is a Special Agent with the Drug Enforcement Administration (DEA) and has been so employed since February of 2016. As a law enforcement officer, your affiant has used a variety of methods investigating drug related crimes, including, but not limited to, visual surveillance, witness interviews, the use of search warrants, confidential informants, undercover agents, pen registers/trap and trace devices, mobile tracking devices, and Title III wire interceptions.

2. Your affiant is currently assigned to the West Palm Beach District Office of the DEA Miami Field Division and has been so assigned for 8 years.

3. As a DEA special agent, your affiant's primary responsibilities are enforcing federal laws as set forth in the United States Code (U.S.C.), including violations of Title 21, U.S.C. §§ 952 (a) and 963, Conspiracy to Import a Controlled Substance into the United States (cocaine).

4. Based on your affiant's training and experience, and based upon interviews with defendants, informants, and other witnesses and participants in drug trafficking activity, your affiant is familiar with the ways that drug traffickers conduct their business. Affiant's familiarity includes: the means and methods drug traffickers use to import and distribute drugs; their use of cellular telephones and countersurveillance to facilitate drug activity; and their use of numerical codes and code words to conduct drug transactions. Your affiant is also familiar with how drug traffickers conceal, convert, transmit, and transport their drug proceeds, including, but not limited to, using carriers to transport currency and proceeds, and using third parties to purchase or hold title to assets.

5. This affidavit is submitted in support of a criminal complaint charging Malik DELANCY ("DELANCY"), Fiero COOPER ("COOPER"), Darren SEARS ("SEARS"), Ivan CURRY, and Jeremiah RUSSELL ("RUSSELL"), with violations of Title 21, U.S.C. §§ 952(a) and 963, Conspiracy to Import a Controlled Substance into the United States (cocaine); as well as Title 8, U.S.C. § 1324 (a)(1)(A)(iv), Encouraging and Inducing Aliens to Enter the United States.

6. During the course of this investigation, I was directly involved with or have been made aware of the following facts:

7. Since February 2024, law enforcement initiated an investigation targeting Transnational Criminal Organizations (TCO's) who organize, transport and distribute multi hundred-kilogram quantities of cocaine and illegal aliens into the United States by way of vessel. Information within this affidavit was learned through the investigation by other co-case agents and the use of DEA Confidential Sources (CSs) with knowledge of the organization.

8. In February 2024, knowledge was gained about the TCO and their methods of transportation and utilization of vessels with captains and organizers. Law enforcement agents began targeting members of the Fiero Cooper TCO (hereinafter referred to as COOPER TCO).

9. In April 2025, a confidential source with the Davie Police Department provided them information about suspected illegal activity at 3060 SW 59th Avenue, Davie, Florida. In April and July, 2025, Davie Police Department conducted surveillance and observed numerous individuals carrying totes from the residence to awaiting vehicles. Through further investigation, Davie Police Department learned federal agents had an investigation involving common targets. Agents with DEA then began conducting surveillance, along with the Davie Police Department.

10. Since July 2025, federal law enforcement agents conducted physical surveillance on frequented locations of multiple members of the COOPER TCO within the Southern District of Florida, to include Davie and Dania Beach, Florida, within Broward County. Agents conducted multiple days of physical surveillance and gained intelligence on vessels that may be utilized by the TCO.

11. During the month of August, 2025, agents conducted surveillance on a frequented residence, 4473 SW 51st Street, Dania Beach, Florida, in Broward County, and observed a 38-foot Contender center-console vessel with triple outboard engines (hereinafter referred to as VESSEL 1) being towed by a large pickup truck. As agents continued surveillance, agents ultimately observed the center console vessel being offloaded at a boat ramp in Fort Pierce, Florida on August 29, 2025.

12. At approximately 7:24 p.m., VESSEL 1 was launched at the Stan Blum boat ramp in Fort Pierce, Florida. Agents observed two black males enter VESSEL 1 and depart the boat ramp. Agents observed Terrance WALLACE, Malik DELANCY, and Jeremiah RUSSELL standing next to the vessel. WALLACE and RUSSELL were observed operating VESSEL 1.

13. As surveillance continued, agents observed VESSEL 1 pull behind 255 Marina Drive, Fort Pierce, Florida and dock up to the seawall. DELANCY and RUSSELL exited the center console and walked inside of the residence.

14. As surveillance continued at 255 Marina Drive, agents observed another center console vessel at a gas station being towed by a tow-truck. This vessel is described as a 26-foot Grady White cuddy-cabin vessel with twin outboard engines, bearing the name "Mastur Baiter" on the side of the vessel (hereinafter referred to as VESSEL 2). Agents then observed COOPER

pumping gas into VESSEL 2. Agents observed COOPER walk inside the gas station. Undercover law enforcement agents verified COOPER's identity.

15. Shortly after, agents surveilled VESSEL 2 as it was being towed to the same Stan Blum boat ramp as VESSEL 1. Law enforcement agents then observed the VESSEL 2 arrive at 255 Marina Drive and moor up next to VESSEL 1. As agents continued surveillance on the residence, COOPER was observed with other persons walking inside and outside of the residence, to and from VESSEL 1 and VESSEL 2, in what appeared to be preparing for a drug smuggling venture.

16. On August 30, 2025, at approximately 4:30 a.m., agents observed the above-mentioned center console vessels being prepared for departure from the residence. At approximately 4:48 a.m., agents observed VESSEL 1 and VESSEL 2 depart from the residence and the Fort Pierce Inlet for the Bahamas.

17. Shortly after, the United States Coast Guard advised agents that two vessels were observed traveling eastbound at approximately 30 knots.

18. Later that day, at approximately 5:35 p.m., law enforcement agents observed three vessels traveling westbound towards the United States. Agents reported the descriptions of VESSEL 1, VESSEL 2, and another unknown vessel type with a forward compartment (herein referred to as VESSEL 3).

19. At approximately 5:44 p.m., as surveillance continued on the residence and vehicles utilized by the organization, agents observed a van conducting counter-surveillance at the Fort Pierce Inlet in efforts to spot law enforcement.

20. At approximately 7:02 p.m., as these vessels entered United States waters, law enforcement vessels activated their blue lights and sirens. VESSEL 1 and VESSEL 2 were

successfully stopped by law enforcement. VESSEL 3, which was approximately 30 feet in length, failed to heave for law enforcement. VESSEL 3 required engine disabling by law enforcement, which ultimately ended in a successful stop. VESSEL 1 and VESSEL 2 were previously observed by law enforcement departing the Fort Pierce Inlet earlier that day.

21. Simultaneously as these vessels were being boarded by law enforcement, agents observed Teshawn CURRY, WALLACE, and Keven BERARD at the Fort Pierce Inlet. Teshawn CURRY and WALLACE then entered the van and abruptly departed the area.

22. As Teshawn CURRY and WALLACE departed the area, agents conducted a traffic stop of the van for suspected illegal tint and detained Teshawn CURRY and WALLACE for further investigation.

23. As VESSEL 1 was boarded, agents observed COOPER and Darren SEARS in control of the vessel. As agents made contact with COOPER and SEARS, approximately 104 kilograms of suspected cocaine were discovered within two igloo coolers located in plain view on the deck in the back of the vessel. Furthermore, within the vessel, agents located 12 Chinese migrants on board in the center cubby portion.

24. As VESSEL 2 was boarded, agents made contact with Malik DELANCY and Jeremiah RUSSELL, who were in control of the vessel. Upon boarding VESSEL 2, law enforcement agents discovered six Chinese migrants inside the cuddy cabin.

25. After VESSEL 3 was disabled by law enforcement, agents identified Ivan CURRY in control of the vessel. Upon boarding, 64 kilograms of suspected cocaine were discovered within seven suitcases located in the back of the vessel under seat cushions, as well as 12 Chinese migrants. Three of the kilograms were discovered in a backpack containing CURRY's passport and his two cellphones.

26. After a total of 168 kilograms of cocaine and 31 Chinese migrants were discovered on the three vessels, Teshawn CURRY and WALLACE were detained and brought to the United States Coast Guard Station in Fort Pierce.

27. Shortly after Teshawn CURRY and WALLACE were detained, Ivan CURRY, DELANCY, RUSSEL, COOPER and SEARS were detained by law enforcement and then transferred to the United States Coast Guard (USCG) Cutter Robert Ethridge, along with the 31 Chinese migrants.

28. On the USCG Cutter, officers conducted biometric checks of the 30 adults, and one child, which were identified as follows, and without legal status in or to enter the United States:
    a. Y.L. – an adult male citizen of China
    b. M.L. – a minor male citizen of China
    c. X.W. – an adult female citizen of China
    d. J.J. – an adult female citizen of China
    e. S.C. – an adult female citizen of China
    f. X.L. – an adult male citizen of China
    g. Y.L. – an adult female citizen of China
    h. A.P. – an adult female citizen of China
    i. Y.L. – an adult female citizen of China
    j. Z.X. – an adult female citizen of China
    k. W.Z. – an adult male citizen of China
    l. L.L. – an adult female citizen of China
    m. J.G. – an adult male citizen of China
    n. X.J. – an adult female citizen of China
    o. M.L. – an adult female citizen of China

p. B.Z. – an adult female citizen of China

q. B.C. – an adult male citizen of China

r. L.H. – an adult male citizen of China

s. J.L. – an adult male citizen of China

t. Z.L. – an adult male citizen of China

u. H.Y. – an adult male citizen of China

v. Z.H. – an adult male citizen of China

w. J.L. – an adult male citizen of China

x. S.J. – an adult male citizen of China

y. G.Z. – an adult male citizen of China

z. C.L. – an adult male citizen of China

aa. Y.L. – an adult male citizen of China

bb. G.S. – an adult male citizen of China

cc. X.L. – a adult male citizen of China

29. On August 31, 2025, at approximately 4:26 p.m., agents conducted a presumptive test of the suspected drugs, which tested positive for the presence of cocaine. The recovered drugs were counted resulting in a preliminary total count of 168 kilograms. The seized cocaine was stored and kept in evidence pending laboratory testing, in accordance with DEA policies and procedures.

30. On this same date, at approximately 11:40 p.m., agents conducted an interview with Teshawn CURRY. Agents began the interview by asking Teshawn CURRY standard booking questions. Agents informed Teshawn CURRY that before discussing any facts related to his arrest, agents must first advise Teshawn CURRY of his constitutional rights.

31. At approximately 11:57 p.m., agents read Teshawn CURRY his constitutional rights, per *Miranda*, utilizing DEA Form 13A. At the request of Teshawn CURRY, agents read these rights a second time. Teshawn CURRY stated he understood his constitutional rights and agreed to speak to law enforcement. The following is a synopsis of the interview and should not be considered verbatim.

32. Teshawn CURRY explained he arrived in Fort Lauderdale, Florida on a Carnival Cruise on August 28, 2025, along with family members. According to Teshawn CURRY, on August 29, 2025, a known target of the investigation proposed for Teshawn CURRY to be part of this venture. Teshawn CURRY indicated he (Teshawn CURRY) agreed to participate in the venture, which led to WALLACE picking up Teshawn CURRY from his (Teshawn CURRY's) Fort Lauderdale, Florida area hotel, to meet with other co-conspirators at a rental property in Fort Pierce, Florida. Shortly after Teshawn CURRY's arrival at the rental property, two boats arrived and parked in the rear of the property, where COOPER, WALLACE, and others staged in preparation for the venture.

33. Teshawn CURRY further explained that on August 30, 2025, at approximately 5:00 a.m., multiple co-conspirators departed the rental property aboard a large and a medium sized boat towards The Bahamas to pick up "something," and bring that back into the United States via the Fort Pierce, Florida inlet. Agents asked Teshawn CURRY to define what he believed "something" was. Teshawn CURRY stated, "we were picking up something illegal." Agents again asked Teshawn CURRY to clarify. Teshawn CURRY further stated the other co-conspirators were picking up "drugs" to bring into the United States via the Fort Pierce, Florida inlet. Teshawn CURRY explained that he (Teshawn CURRY) knew they were transporting drugs, as the group had successfully done these types of drug ventures in the past.

34. Teshawn CURRY admitted his role was to watch for "you guys," while COOPER and others arrived in the suspect boats from The Bahamas. Agents asked Teshawn CURRY to clarify what he meant by "you guys." Teshawn CURRY explained his job was to look out for law enforcement presence in the

area, and to warn the other co-conspirators if police presence was observed in the Fort Pierce, Florida inlet.

35. In the afternoon of August 30, 2025, Teshawn CURRY, WALLACE, and BERARD established counter-surveillance at the Fort Pierce, Florida inlet, which was observed by law enforcement surveillance units. Teshawn CURRY, WALLACE, and BERARD remained at the inlet in a location with a clear and unobstructed view of the inlet.

36. Teshawn CURRY stated that, later the same day, and close to the time where the boat captains were due to arrive from The Bahamas with the suspect boats and the drugs, Teshawn CURRY received a telephone call from one of the boat captains, who was in route on one of the boats transporting the drugs. According to Teshawn CURRY, he was informed that the suspect vessels "were being followed." Teshawn CURRY indicated he assumed that the suspect boats were being followed by law enforcement maritime elements; however, the captain did not specify that in the short telephone call. Additionally, Teshawn CURRY witnessed WALLACE communicating directly with other captains of the vessels via cellular telephone.

37. Teshawn CURRY admitted that after his call from one of the boat captains, and communications between WALLACE and COOPER, both Teshawn CURRY and WALLACE decided to leave the inlet, afraid that law enforcement was aware of their illegal activity. Teshawn CURRY explained that WALLACE was the driver of the van, while Teshawn CURRY occupied the front passenger seat, and the pair attempted to get away from the inlet. Teshawn CURRY stated that shortly after leaving the immediate area of the Fort Pierce, Florida inlet, a marked police unit initiated a traffic stop by activating its blue and red lights.

38. Teshawn CURRY explained that he (Teshawn CURRY) utilized a black Samsung cellular telephone to communicate with the additional co-conspirators, before and during the drug smuggling venture.

9

Teshawn CURRY further admitted the group communicated via encrypted applications, primarily via WhatsApp. Teshawn CURRY confirmed the lone cellular telephone seized from Teshawn CURRY's person during his arrest was the same cellular telephone utilized to communicate with co-conspirators. Teshawn CURRY provided law enforcement agents with written consent to search Teshawn CURRY's cellular telephone.

39. Teshawn CURRY admitted to agents that he understood his conduct was criminal in nature, as he understood his role in the drug smuggling venture. Furthermore, Teshawn CURRY explained that within the past six months, he (Teshawn CURRY) had acted in the same role as a lookout for the criminal group in four previous successful drug smuggling ventures. Teshawn CURRY explained that although he expected a financial gain for his actions, he was not paid any money. Emphasizing his point, Teshawn CURRY pointed agents to WhatsApp conversations stored in his cellular telephone, in which Teshawn CURRY is asking for owed payments.

40. At approximately 10:25 p.m., agents read WALLACE his constitutional rights per *Miranda* utilizing DEA Form 13A. WALLACE stated he understood his constitutional rights and agreed to speak to law enforcement. The following is a synopsis of the interview and should not be considered verbatim.

41. According to WALLACE, a known target of the investigation proposed for WALLACE to be part of the venture. WALLACE stated he agreed to participate in the venture, which led to WALLACE picking up CURRY from his (Teshawn CURRY's) girlfriend's apartment located in Davie, Florida, as well as the other identified co-conspirator, to meet with other co-conspirators at a rental property in Fort Pierce, Florida. Shortly after WALLACE's arrival at the rental property, two boats arrived and parked in the rear of the property, where WALLACE, Teshawn CURRY and others staged in preparation for the venture.

42. WALLACE further explained that on August 30, 2025, at approximately 5:00 a.m., multiple co-conspirators departed the rental property aboard two boats, then traveled towards The Bahamas to go fishing and sell the Grady White vessel to someone in The Bahamas. WALLACE then stated that he, Teshawn CURRY, and the other conspirator were not going fishing; they were there to inform the other conspirators if it was clear to return in the Fort Pierce Inlet. WALLACE stated he (WALLACE) was asked to be a lookout because the registration on the boat was not good. WALLACE explained he (WALLACE) was not a boat captain, but it does not make sense to leave from Fort Pierce because West Palm Beach is closer to the West End located in Freeport, Bahamas. WALLACE stated he knew something was not right. WALLACE admitted he (WALLACE) had been a lookout in the past.

43. WALLACE admitted his role was to provide the "all clear," while the others arrived in the suspect boats from The Bahamas. Agents asked WALLACE to clarify what he meant by "all clear." WALLACE explained his job was to look out for law enforcement presence in the area, and to signal the other co-conspirators if police presence was observed in the Fort Pierce, Florida inlet.

44. In the afternoon of August 30, 2025, WALLACE, Teshawn CURRY, and the other identified co-conspirator established counter-surveillance at the Fort Pierce, Florida inlet, as observed by law enforcement surveillance units. WALLACE, Teshawn CURRY, and the other identified co-conspirator remained at the inlet in a location with a clear and unobstructed view of the inlet.

45. WALLACE gave agents consent to search his cellular device, which is a red iPhone 11, and provided the passcode. While examining the contents of WALLACE's iPhone, it was discovered that WALLACE was in contact with Teshawn CURRY, and other identified co-conspirators that were interdicted with approximately 168 kilograms of cocaine and illegal aliens. The contents of

11

WALLACE's WhatsApp conversations indicate that WALLACE had knowledge and participated in the importation of cocaine to the United States. Specifically, WALLACE was in contact with the captain of one the vessels during the interdiction and was urging them to flee law enforcement. WALLACE also provided updates on the position of law enforcement throughout the day, as well as during other smuggling events that were successful. WALLACE also had video of law enforcement vessels in the same Fort Pierce Inlet from prior ventures, which were sent to interdict the vessels smuggling cocaine.

46. On September 3, 2025, upon arrest and waiver of his *Miranda* rights, Ivan CURRY, who was on VESSEL 3, admitted to agents that he knew he was transporting cocaine as well as illegal aliens. Ivan CURRY also stated they typically use coolers to transport the cocaine.

47. On September 3, 2025, upon arrest and waiver of his *Miranda* rights, COOPER, who was on VESSEL 1, admitted to agents that he knew he was transporting illegal aliens. COOPER would not discuss anything about the cocaine; however, when his vessel was originally boarded by law enforcement, COOPER stated to agents there was cocaine in the coolers on the vessel.

48. On September 3, 2025, upon arrest and waiver of his *Miranda* rights, DELANCY, who was on VESSEL 2, admitted to agents that he knew he was transporting cocaine as well as illegal aliens. DELANCY also stated he knew COOPER transported cocaine and he (DELANCY) was a look-out for a shipment COOPER did in early August 2025.

49. On September 3, 2025, upon arrest and waiver of his *Miranda* rights, RUSSELL, who was on VESSEL 2, admitted to agents that he was transporting illegal aliens but denied knowledge of the cocaine.

50. On September 3, 2025, upon arrest and waiver of his *Miranda* rights, SEARS, who was on VESSEL 1, admitted to agents that he was transporting illegal aliens but denied knowledge of the cocaine.

51. Based on the foregoing, I believe that probable cause exists for the issuance of a Complaint for Ivan CURRY, DELANCY, COOPER, SEARS, and RUSSELL, for violations of Title 21, U.S.C. §§ 952(a) and 963, Conspiracy to Import a Controlled Substance into the United States (cocaine); as well as Title 8, U.S.C. § 1324 (a)(1)(A)(iv), Encouraging and Inducing Aliens to Enter the United States.

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Joseph Verneer, Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me in accordance with the requirements of Fed.R.Crim.P. 4.1 by FaceTime on this 4th day of September, 2025.

Patrick M. Hunt
United States Magistrate Judge

13